UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SECURITIES AND EXCHANGE
COMMISSION,

                          Plaintiff,

                                              Case No. 15-cv-00864

                  v.

JILL D. COOK
and
MARK C. PIERCE,

                          Defendants.

**<u>COMPLAINT</u>**

    Plaintiff, the United States Securities and Exchange Commission, alleges

as follows:

**I.      SUMMARY**

    1.      Jill Cook, the Chief Credit Officer of Los Alamos National Bank

("the Bank"), and Mark Pierce, the Bank's Senior Lending Officer, participated in

a fraudulent scheme to misrepresent the quality of the Bank's loan portfolio and

understate loan losses and to conceal from investors and the OCC the true

nature of its loan portfolio and assets, thereby overstating the Bank's capital ratio

and the income of the Bank's parent, Trinity Capital Corporation ("TCC"), a

public, Los Alamos-based, bank holding company. TCC and the Bank are

collectively referred to as "Trinity." Cook and Pierce also aided and abetted material misrepresentations made by Trinity in TCC's public filings.

2. In furtherance of the scheme and to hide the true nature of Trinity's diminishing loan portfolio from investors and the OCC and to avoid reporting loan losses, from 2010 until at least July 2012, Cook, Pierce, William Enloe, TCC's CEO, and others: (i) refused to downgrade loans on a timely basis, including hiding problem loans by extending loan maturities, reducing interest rates, or lending new money to delinquent borrowers to service the existing debt; (ii) failed to designate loans as impaired, including failing to designate modified and restructured loans as troubled debt restructurings or TDRs; (iii) failed to measure the impairment properly on impaired loans and (iv) purposely overvalued real estate owned by the bank.

3. Cook and Pierce each took numerous plainly fraudulent and egregious actions in furtherance of the scheme. Among other things, Pierce and Cook back dated loan documents; hid information from Trinity's auditors and its primary regulator, the Comptroller of the Currency ("OCC"); directed others in the bank to fraudulently document loans to make the loans appear more favorable than they were; engaged in "creative ways" to disguise borrowers' failures to make timely loan repayments; purposely delayed receipt of appraisals that would have resulted in impairments; "rejected," ignored and deleted other appraisals that would have resulted in impairments; used fraudulent "extend and pretend" techniques – loaning money to existing borrowers so they can stay "current" on loans – to avoid properly classifying loans; and even shredded loan

documentation. In her own words, Cook's approach to loan documentation was to falsify documents as needed and "ask forgiveness later!"

4.     In January 2010, the OCC placed the Bank under a formal supervisory agreement, which placed certain restrictions on the Bank. The fraudulent scheme was motivated, at least in part by Trinity's desire to be released from the supervisory agreement, which would only occur after Trinity met specific requirements, including decreasing non-performing loans, increasing earnings, and increasing a capital ratio. Since reporting loan losses jeopardized Trinity's ability to meet these requirements, Trinity went to great lengths including fraud to avoid reporting such losses and instead hid them.

5.     As a result of this fraud, TCC's quarterly and annual filings with the Commission during 2010, 2011, and the first two quarters of 2012 contained material misstatements, including dramatically understating its bad loans, its loan losses, and overstating its income.

6.     In its 2010 annual filing, TCC:

- understated its loan loss provisions by 25%;

- understated its impaired loans by approximately 81%;

- understated its TDRs by approximately 878%;

- reported before tax income of $1.9 million, when it should have reported losses of $5.4 million; and

- reported net loss available to common shareholders of $444,000 when it should have reported net loss available to common shareholders of $4.2 million.

7.    In its 2011 annual filing, TCC:

- understated its loan loss provisions by 73%;

- understated its impaired loans by approximately 70%;

- understated its TDRs by approximately 643%;

- reported before tax income of $10 million, when it should have reported losses of $13.7 million; and

- reported net income available to common shareholders of $5 million when it should have reported net loss available to common shareholders of $25.5 million.

8.    In its filing for the first quarter of 2012, TCC:

- misstated its impaired loans;

- reported before tax income of $4 million, when it should have reported losses of $467,000; and

- reported net income available to common shareholders of $2 million when it should have reported net loss available to common shareholders of $1 million.

9.    In its filing for the second quarter of 2012, TCC:

- misstated its impaired loans

- reported before tax losses of $3.9 million, when it should have reported losses of $2 million; and

- reported net losses available to common shareholders of $2.8 million when it should have reported net loss available to common shareholders of $2.3 million.

## II.   VIOLATIONS

10.     As a result of the conduct alleged in this complaint, Trinity (i) violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13].

11.     As a result of the conduct alleged in this complaint, Cook (i) violated, or in the alternative aided and abetted, Trinity's violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; (ii) violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2]; and (iii) aided and abetted Trinity's violations of Sections 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) of the Exchange Act ") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78(m)(b)(2)(B)] and Rules 10b-5(b), 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c), 240.12b-20, 240.13a-1, and 240.13a-13]. As a result of these violations, the Commission seeks a judgment enjoining Cook from violating the provisions set forth above, an officer and director bar, and civil penalties.

12.     As a result of the conduct alleged in this complaint, Pierce (i) violated, or in the alternative aided and abetted, Trinity's violations of Section

17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)]; (ii) violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2]; and (iii) aided and abetted Trinity's violations of Sections 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)], and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B) of the Exchange Act ") [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78(m)(b)(2)(B)] and Rules 10b-5(b), 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c), 240.12b-20, 240.13a-1, and 240.13a-13]. As a result of these violations, the Commission seeks a judgment enjoining Pierce from violating the provisions set forth above, an officer and director bar, and civil penalties.

### III.     JURISDICTION AND VENUE

13.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 77u(d)]. The Court has jurisdiction pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)-(e) and 78aa]. The Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

14.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)] because the Defendants reside in this District and the acts, practices and courses of business constituting the violations alleged in this Complaint occurred within this District and elsewhere.

## IV. DEFENDANTS AND RELATED PARTIES

15.     **Jill D. Cook** is a 47-year-old resident of Los Alamos, New Mexico. Cook started working at Trinity shortly after high school. In 2001, she was promoted to Senior Vice President and Chief Credit Officer ("CCO"), a position she held until December 2012, when she was terminated.

16.     **Mark C. Pierce** is a 49-year-old resident of Santa Fe, New Mexico. From 1998 to 2000 and from 2008 to 2010, Pierce was a loan officer at Trinity. In 2010, he was promoted to Senior Loan Officer ("SLO"), a position he held until April 2013, when he resigned. Pierce is still employed in the banking industry.

17.     **Trinity Capital Corporation** is a New Mexico corporation headquartered in Los Alamos, New Mexico. Trinity is the holding company of Los Alamos National Bank, which it wholly owns. Trinity's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act. In both 2010 and 2012, Trinity issued securities under a registration statement filed on Form S-8 in 2005, which incorporated by reference subsequent filings. Trinity obtained services from its employees in part through compensation using this stock. Because TCC's primary business is the Bank, TCC's consolidated financial statements are principally the financial statements of the Bank.

18. **Los Alamos National Bank** is a national bank, headquartered in Los Alamos, New Mexico. As of December 31, 2013, the Bank had total assets of $1.4 billion. The Bank is wholly-owned by Trinity Capital Corporation. The Banks' financial statements are consolidated into the financial statements of TCC.

19. **William C. Enloe** is a resident of Los Alamos, New Mexico. Enloe worked at Trinity from 1971 until February 1, 2013, when he was asked to resign. From 1979 until 1994 he was the President of Trinity, and from 1994 to February 1, 2013, Enloe served as Trinity's CEO. To settle the Commission's charges against him, Enloe consented, without admitting or denying the findings, to the entry of a Commission Order.

## V.  FACTS

### A.  Definitions

20. "**ALLL**" (Allowances for Loan and Lease Losses), is a valuation reserve established and maintained by charges against a bank's operating income. It is an estimate of uncollectible amounts or losses used to reduce the book value of loans and leases to the amount a bank can expect to collect.

21. "**Net income available for common shareholders**" is a corporation's net income after income taxes minus the dividends payable to the preferred shareholders.

22. The "**OCC**" is a federal agency that serves to charter, regulate and supervise national banks. The OCC monitors banks to ensure that they are operating safely, and meeting all requirements. In particular, the OCC monitors

capital, asset quality, management, earnings, liquidity, sensitivity to market risk, information technology, compliance and community reinvestment.

23.    "**OREO**" (Other Real Estate Owned) is real property owned by a bank and is most frequently a result of a bank's foreclosure on real property as a result of default by the borrower who used the property as collateral for the loan. Most items in this category are available for sale.

24.    A "**TDR**" (troubled debt restructuring) is a restructured debt in which a creditor, for economic or legal reasons related to a debtor's financial difficulties, grants a concession to the debtor that it would not otherwise consider.

25.    The "**Tier 1 capital ratio**" is the comparison between the bank's core equity capital and total risk-weighted assets. A bank's core equity capital ("Tier 1 capital") is the measure of a bank's financial strength based on the sum of its equity capital and disclosed reserves. A bank's risk-weighted assets include all assets that are systematically weighted for credit risk.

**B.    Background**

26.    Trinity is a full-service commercial banking institution with six branch offices in Los Alamos, Santa Fe, and Albuquerque, New Mexico. Trinity enjoyed financial success until the financial crisis took hold in 2008. As the New Mexico economy declined, Trinity experienced declining income due to an increase in problem loans and a decrease in the collateral values supporting its loan portfolio and OREO.

27.     As the Bank's primary regulator, the OCC conducted periodic examinations of, among other things, the Bank's procedures, policies, books, records, assets, and liabilities.

28.     Trinity's worsening financial situation was a significant issue during its 2009 examination by the OCC. Among other things, the OCC's 2009 Report of Examination found that the Bank: (i) employed management who did not have sufficient objectivity and expertise; (ii) had an excessive level of problem and non-performing loans; (iii) did not consistently risk rate loans accurately or identify problem loans; (iv) had not obtained timely collateral valuations for all downgraded loans; and (v) had not documented all relevant information when evaluating a loan for impairment.

29.     As a result of the issues uncovered, the OCC placed Trinity under an OCC supervisory agreement and required it to enhance loan department staffing and training, reduce "criticized assets" (problem loans), ensure loans were properly graded, and increase its Tier 1 capital ratio above 10%. The OCC also specifically instructed Trinity to stop Enloe from making loans. OCC was told that Enloe would stop lending and that Enloe's lending authority had been removed. Finally, Trinity was prohibited from issuing dividends or paying incentive-based executive compensation while the OCC supervisory agreement was in effect.

30.     As detailed further below, in response to this supervisory agreement and in order to overstate TCC's reported income and misstate other key financial metrics, Cook, Pierce and others at the Trinity engaged in an

involved scheme in which they dramatically understated impairments required on loans, directed that loans be improperly graded, overstated the value of the Bank's real estate holdings, and concealed from investors and the OCC the true nature of its loan portfolio and assets.

31.     Trinity's loan department was sub-divided into various areas that included lending, collections, OREO, legal, and credit analysis. Cook supervised the entire loan department.

32.     The scheme carried out by Trinity, Cook, Pierce, Enloe, and others was temporarily successful; Trinity quadrupled its reported net income from $1.7 million in 2010 to $7.1 million in 2011.

33.     Due to Trinity's apparent continued improvement in decreasing non-performing loans, improving earnings, and getting its Tier 1 capital ratio above 10%, the OCC released Trinity from the OCC Agreement on April 4, 2012.

34.     The scheme began to unravel in May 2012, however, when a Trinity employee raised concerns about how Trinity was using appraisals and managing and accounting for certain loans. When the employee did not receive an appropriate response from Trinity's management, he provided information to the OCC. As a result, the OCC's July 2012 exam resulted in a deep dive into numerous problem loans identified by the employee, as well as extensive questioning of Cook and others regarding information that had been hidden from the OCC.

35.     In November 2012, Trinity filed a Form 8-K explaining that investors should not rely on its previously-filed financial statements from 2006 forward, and

it began working on a restatement. The resulting "restatement project" spanned over two years. On December 12, 2014, Trinity filed its Form 10-K for the year ended December 31, 2013, which included the restatement of Trinity's consolidated financial data for the year ended December 31, 2011 and the quarterly periods ended March 31, 2012 and June 30, 2012, and the restated, unaudited, selected consolidated financial data for the year ended December 31, 2010.

36.     According to its restatement, TCC's provision for loan losses was understated by $6.8 million (25%) in 2010, $22.3 million (73%) in 2011, and $4.5 million (68%) in the first quarter of 2012. TCC overstated its provision for loan losses for the second quarter of 2012 by $2.3 million (31%). Additionally, in 2011, TCC's OREO losses were understated by $364,000 (10%)

**C.     Relevant Accounting Principles and Trinity's Loan Policy**

37.     Banks carry loans on their balance sheets as assets and record the revenue from interest on the loans on their income statements. According to Generally Accepted Accounting Principles ("GAAP"), estimated loan losses must be accrued when it is probable that losses have been incurred and the amount of the loss can be reasonably estimated. These loan losses are recorded on the balance sheet as ALLL. Any increase in the ALLL must be accompanied by the recording of a provision for loan losses on the income statement, thereby increasing reported losses. Trinity's ALLL included two components: (1) the allowance required for impaired loans, which are evaluated and measured individually; and (2) the allowance required for un-impaired loans, which are

grouped by loan grade and type and collectively evaluated in pools. As detailed below, Trinity misstated both components of its ALLL throughout the relevant period and failed to report required losses.

38.     The loss provision for individually impaired loans is accounted for under ASC 310-10-35, Receivables-Overall-Subsequent Measurement. ASC 310-10-35-16 provides that a loan is impaired when "it is probable a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement." According to GAAP, if a loan is impaired, the loss must be measured, reported, and added to the ALLL.

39.     When loans are changed, for example by a restructure, extension or other modification, GAAP requires the transaction be evaluated to determine if the change constitutes a TDR. Pursuant to ASC 310-40-15-5, a loan is a TDR if there is a restructuring for a borrower in financial difficulty and the creditor grants a concession to the borrower that it would not otherwise consider. If a loan is determined to be a TDR, GAAP considers the loan individually impaired and requires the amount of the impairment to be measured.

40.     If a loan is impaired, the amount of impairment must be measured and recorded as an expense and reported as a loss with a corresponding amount recorded to the ALLL. An allowance must be measured for each impaired loan. For individually impaired loans, GAAP permits the impairment to be measured using the fair value of the underlying collateral if the loan is collateral dependent, which is the method Trinity typically utilized. GAAP requires that the best information available in the circumstances be used to determine fair value.

41.     Loans that are not impaired are collectively evaluated for loss pursuant to ASC 450, Contingencies. An estimated loss rate is derived from actual historical losses adjusted by a qualitative loss factor to take into account current economic and market conditions not reflected in the historical loss rate. The estimated loss rate is used to calculate the amount of reported losses for each loan category, with a corresponding amount added to the ALLL.

42.     Pursuant to ASC 310-40-40-3, OREO is to be valued upon receipt at fair value less costs to sell and on an ongoing basis measured at the lower of its carrying amount or fair value less cost to sell. GAAP and Rule 9-04 Item 14(d) of Regulation S-X required the Bank to record on its income statement any loss on OREO.

43.     Regulation S-K Item 303(a) requires discussion in the MD&A sections of public filings any "information that the registrant believes to be necessary to an understanding of its financial condition." Bank holding companies, such as TCC, are directed to SEC Industry Guide 3, which directs that bank holding companies discuss the policy for placing loans on nonaccrual status (meaning the Bank would no longer accrue interest on the loan) and state the aggregate of loans in the following categories: nonaccrual, accruing loans which are contractually past due 90 days or more, and other loans that are TDRs. As described below, because Trinity failed to accurately report loans and TDRs, its 2010 and 2011 Forms 10-K contained false disclosures regarding these items.

44.     Cook and Pierce understood relevant GAAP and Trinity's loan accounting policies.

45.     Trinity's loan policy included seven loan grades: pass1, pass2, pass3, "special mention," "substandard," doubtful, and loss. Loans were to be graded "special mention" when they had potential weaknesses that deserved management's close attention. Loans were to be graded "substandard" when they demonstrated a well-defined weakness. Internal training further elaborated on the characteristics of substandard loans, including those that are seriously past due (60 days or more), have insufficient cash flows, unprofitable operations and/or inadequate debt service coverage, questionable repayment source, and require advances to fund interest payments. Trinity determined impairment estimates for pools of loans based on the loan grade and historical losses. Lower graded loans generally result in higher impairment estimates. The policy was maintained and updated by Cook, and reviewed and approved by the TCC Board at least annually.

46.     Trinity's loan policy provided that it was loan officers' and senior management's responsibility to ensure that loans were properly graded, moved to non-accrual, and charged off. The OCC Agreement also placed responsibility for grading loans on loan officers and senior management. Cook and Pierce were each members of "senior management" in the loan department.

47.     Additionally, Trinity conducted internal action plan and loan grade training annually for Cook, Pierce, and others. The training covered topics that included TDRs, impairments, and impairment measurements. Accounting

employees also discussed key accounting issues, including subsequent events and the importance of identifying TDRs with Cook.

**D.    The Fraudulent Scheme.**

48.    Trinity, Cook, Pierce and Enloe engaged in a multi-pronged fraud, all designed to artificially and fraudulently increased TCC's reported income and improve other significant financial metrics. Pursuant to the scheme, Cook, Pierce, Enloe and others, a) failed to identify impaired loans; b) for the loans that were identified as impaired, understated the amount of the impairment; c) failed to properly grade non-impaired loans; and d) overstated the value of OREO.

49.    Pursuant to the scheme, Cook, Pierce, Enloe and others, a) failed to identify impaired loans; b) for the loans that were identified as impaired, understated the amount of the impairment; c) failed to properly grade non-impaired loans; and d) overstated the value of OREO.

**i.    Trinity Failed to Identify Individually Impaired Loans Including Troubled Debt Restructurings.**

50.    Trinity, Cook, Pierce, Enloe, and others, failed to identify individually impaired loans and TDRs in order to avoid reporting losses and increases to its ALLL. This fraudulently misrepresented the health of the Bank's loan portfolio and helped Trinity comply with the OCC supervisory agreement.

51.    To identify individually impaired loans, Trinity reviewed loan relationships graded less than "pass" where over $750,000 was owed to the Bank. Loan officers completed "Action Plans" for these loans each quarter, which included an impairment analysis if the loan officer believed that Trinity would not collect all principal and interest according to the contractual terms of the note.

52.     Cook reviewed all Action Plans each quarter and sometimes made edits. Pierce reviewed some Action Plans and attended meetings each quarter, during which Action Plans were circulated and discussed.

53.     Trinity's loan policy defined TDRs as loans "where the bank granted a concession to their borrower, that would not have otherwise been offered, due to their financial condition." In 2010, the policy provided examples of concessions, including the modification of loan terms to reduce the stated interest rate, and reduce accrued interest. In June 2011, the policy was expanded to include indicators of troubled financial situations. In the case of Action Plan loans, loan officers were explicitly required to determine whether loans were TDRs by checking a box on the Action Plan. If a loan is determined to be a TDR, GAAP considers the loan individually impaired and requires the amount of the impairment to be measured.

54.     As detailed herein, Trinity failed to devise and maintain a system of internal accounting controls sufficient to identify impaired loans and TDRs. The Bank's failure to identify impaired loans, including TDRs, led to material misstatements in the Bank's ALLL and loan loss provisions.

55.     Cook and Pierce knew or were reckless in not knowing that Trinity failed to identify individually impaired loans and TDRs, resulting in the fraudulent concealment of Trinity's true financial condition and material misstatements in TCC's financial statements. Cook and Pierce knowingly, recklessly, and negligently participated in a fraudulent scheme for that purpose, committed numerous acts in furtherance of this scheme, and aided and abetted the

17

fraudulent misstatements made by Trinity in its public filings in 2010 through the second quarter of 2012.

          a.   Trinity Avoided Designating Loans as TDRs

56.    Cook and Pierce failed to identify and evaluate as TDRs loans that were restructured due to borrowers facing financial difficulty, which, therefore, should have been classified as a TDR loan and an evaluation of the necessary impairment performed. TDRs are treated as impaired loans that have to be evaluated for impairment. If impaired, Trinity could be required to report additional losses and increases to the ALLL.

57.    In fact, Pierce instructed loan officers to avoid having loans classified as TDRs. When one officer asked whether Trinity was offering a lower rate "to customers that are in trouble on their current debt obligations," Pierce replied, "[a]s long as we don't make it appear to be a TDR, we should be good." Pierce went on to provide instructions on how to avoid making it look like a TDR: "Don't put it in the [loan approval documentation] that we are reducing the rate to improve cash flow … if possible, use the long time good customer … matching competing bank offer … approach."

58.    In a May 2011 email to Pierce, on which Cook was copied, a loan officer explained that a hotel with a $4 million loan was facing financial difficulties. In light of the hotel's financial difficulties, the loan officer asked to lower the interest rate from 7 percent to at least 5.5 percent, stating, "[i]t would be better to lower to 5% … but after talking to Bill Enloe, that would probably count as a restructured debt and would require downgrading. **Mark, can you confirm if**

**reducing to 5% would be considered 'restructured debt'?**" [Emphasis in original.] Pierce responded, copying Enloe and Cook, saying, "We definitely need to be careful how this proposal is worded in the presentation. Please stay away from stating that we are reducing the rate to improve cash flow and the [debt coverage ratio]. My preference would be to submit the proposal to reduce the rate to 'current market rates' predicated on payment history, LTV, and overall relationship."

59.     On the document that evidenced the modification to the loan, the interest rate change was simply noted as "[i]nterest rate reduced to current market rate on March 1, 2011." Pierce, Cook and Enloe falsely stated the reason for the reduced interest rate to avoid having to classify the loan as a TDR

60.     Trinity's restatement work found this modification to be a TDR and found that the loan should have been downgraded from "pass" to "substandard" as of March 31, 2011.

61.     In another instance, a loan officer had included the following sentence in a loan approval document for the extension of a $250,000 loan: "This loan was granted in December 2011 to payoff and convert the 2nd mortgage to interest only payments until June, 2012." Upon reviewing the document, Pierce asked the loan officer to delete the sentence, explaining, "[t]he way it reads this should be classified as a TDR." The loan officer made the change Pierce requested and, as a result, the loan was not classified as a TDR. Trinity's restatement work identified the loan as a TDR that should have also been graded "substandard" and on nonaccrual as of December 2011.

b. T de Z, LLC

62.     Cook, Pierce, and Enloe, directly and indirectly, also improperly failed to identify loans as impaired, refusing to identify certain non-performing loans as impaired until after granting numerous concessions intended to disguise the true nature of the loan. One example involves a $2 million construction loan provided to T de Z, LLC. In June 2010, the T de Z loan was downgraded to "substandard." After that time, Pierce completed Action Plans on the loan each quarter. According to Trinity's restatement, the T de Z Loans should have been classified as impaired with approximately a $1.1 million loan loss provision recognized as of December 31, 2010; however, it was not classified as impaired until March 2012. This failure resulted in Trinity understating its 2010 provision for loan losses by 5% and overstating its 2010 income before taxes by approximately 120.5%. According to GAAP, if a loan is impaired, the loss must be measured and added to the ALLL.

63.     Throughout 2010 and 2011, Cook and Pierce repeatedly ignored indications that the T de Z Loan was impaired, including identification by Bank employees and consultants of the loan as possibly impaired and the borrower requiring overdrafts to cover loan payments.

64.     In June 2011, Pierce permitted T de Z to overdraw its checking account by $30,000 without the required board approval. On July 18, 2011, he told Cook that "we extended credit to a "substandard" borrower without board approval" and expressed concern over whether the OCC had requested an overdraft report for the month, which would disclose his misconduct. To conceal

the overdraft, a back-dated loan approval document was created that was executed by Pierce and Cook.

65.     The $30,000 overdraft was later cleared by an additional $32,000 being extended from Trinity in connection with an unrelated loan, $30,000 of which was re-routed back to T de Z through transactions designed to hide the source of the funds.

66.     In November 2011, Pierce emailed the borrower, stating "something we need to start planning for is that there is going to be a significant interest payment due on the construction loan in January. I have pretty much exhausted all of my creative ways to cover that here at the Bank."

67.     On December 8, 2011, Pierce sent Cook and Enloe an email and detailed memorandum regarding the T de Z loan. The memo explained that, even if a proposed sale of the property went through, there would be an $800,000 deficiency on the T de Z Loan. Pierce proposed "splitting" that deficiency with T de Z, such that the Bank would charge-off approximately $400,000 and the borrower would owe the Bank approximately $400,000. Pierce noted that if the proposed sale did not take place, the charge-off would be over $1 million. Despite the negative assessment, the loan was not identified as impaired.

68.     In the December 2011 Action Plan for T de Z, which was completed approximately two weeks after his email, Pierce created a false Action Plan that failed to classify the loan as impaired, failed to measure the impairment, and failed to include critical details in his write up of the status of the loan. Cook failed

to correct the Action Plan or take any action to ensure the loan was designated as impaired. As a result, Trinity failed to report required losses and increases to its ALLL.

### ii.  Trinity Failed to Measure Impairments Properly.

69.     Trinity failed to measure impairments properly by relying upon faulty or old appraisals to measure collateral values underlying the impaired loans. By failing to secure reliable appraisals, Trinity fraudulently misrepresented the health of its loan portfolio and avoided reporting loan losses and increases to its ALLL.

70.     It was the Bank's practice to order annual appraisals on loans graded "special mention," "substandard," or worse. Among other things, these appraisals were used to value the Bank's collateral, which was used to measure the loss on individually impaired collateral dependent loans. Pursuant to loan policy, appraisers were to be selected by an employee who had no interest in the loan and appraisals were to be reviewed by an employee with the same level of independence.  In fact, however, appraisals were often reviewed by employees who ultimately reported to Cook, and were, therefore, not independent from the loan process. If the appraisal was deficient, the deficiencies were to be communicated to the appraiser and documented in the appraisal review. If the deficiencies were not corrected or otherwise resolved, a new appraisal was ordered from a different appraiser.

71.     Trinity's appraisal department used a standard engagement letter that required appraisers to value properties in their current state ("as-is"). On

properties still under construction and completed properties generating income, Trinity also ordered appraisals that would provide the value of a property at the time construction was complete ("as-completed") or when the property reached stabilized income ("as-stabilized").

72.     For purposes of measuring the impairment on a collateral dependent loan, Trinity should have considered the "as-is" appraisal value. However, in some instances, the Bank improperly used the higher "as-stabilized" or "as-completed" values in measuring impaired losses. By failing to use proper appraisals, Trinity avoided reporting loan losses and increases to its ALLL, which led to material misstatements in TCC's financial statements.

73.     Cook and Pierce knew or were reckless in not knowing that Trinity understated the expected loss on impaired loans, resulting in the fraudulent concealment of Trinity's true financial condition and material misstatements in TCC's financial statements. Cook and Pierce knowingly, recklessly, and negligently participated in a fraudulent scheme for that purpose, committed numerous acts in furtherance of this scheme, and aided and abetted the fraudulent misstatements made by Trinity in its public filings in 2010 through the second quarter of 2012.

a.   RainbowVision Santa Fe, LLC

74.     One of Trinity's largest loans was to RainbowVision Santa Fe, LLC to construct a retirement facility in Santa Fe, New Mexico. The total amount borrowed was $20.5 million with Trinity lending $16 million and another bank lending the remainder. Each loan was collateralized by the facility.

75.     From, at least, 2010, the RainbowVision Loan was graded "substandard" and identified as impaired, however, Trinity failed to record any impairment losses on the loan until June 2012.

76.     In calculating the impairment through the first quarter of 2012, Trinity used adjusted "as-stabilized" values of $32 million from a January 2010 appraisal and $27.4 million from a January 2011 appraisal. These "as-stabilized" values significantly overstated the current fair value of the collateral, however, because they assumed significant improvements to the facility's operating condition, none of which had occurred.

77.     Throughout the relevant period, Cook and Pierce ignored material information relevant to the property's fair value that indicated the RainbowVision Loan required a significant impairment loss, including:

    a.   At a July 2010 Board meeting, Enloe informed the Board that, if a potential sale on the facility closed, Trinity would incur a loss of $3 million to $4 million. Cook was at the meeting.

    b.   During 2011, Cook and Pierce understood that Enloe had tentatively agreed that Trinity would sell the RainbowVision collateral for prices between $12 million and $14 million, well below the $20 million borrowed, which would have resulted in a large loss for Trinity.

    c.   In an October 2011 email, Pierce told Enloe that he did not believe the facility would sell for $14 million. Enloe responded that he would be happy with a $12 million to $13 million sales price.

        d.  In the first quarter of 2012, a loan officer conducted an internal
analysis that showed that the property could be worth $14 to $15 million, again
well below the $20 million borrowed, assuming some improvements to the
facility's operating condition. Cook and Pierce were notified of this analysis.

        e.  In early July 2012, Pierce learned that the other lender had charged
off its interest in the RainbowVision loan based on a $13 million valuation.

        78.    Cook and Pierce did not include any of this information in the Action
Plans or factor it into the impairment calculations. They also failed to provide this
information to Trinity accountants, the Action Plan reviewers, the external
auditors, and the OCC.

        79.    A new appraisal was ordered in the first quarter of 2012. After
learning from the loan officer that this appraisal was likely to assess a value that
would require an impairment loss, Cook directed the loan officer to have the
appraiser delay sending the appraisal until after Trinity filed its first quarter 2012
Form 10-Q on May 10, 2012. The 2012 "as-stabilized" appraisal came in at a
value that resulted in Trinity booking a $3.2 million impairment loss in the second
quarter of 2012. Due to Cook's action in delaying receipt of the appraisal, Trinity
improperly did not report this significant loss in the first quarter of 2012.

        80.    Trinity's restatement revealed that approximately $8.9 million of
additional loan losses attributable to the RainbowVision loan should have been
recorded during the relevant period. Trinity understated its provision for loan
losses attributable to RainbowVision by $3.3 million or 14.0% in 2010, $5.1
million or 38.2% in 2011, and $500,000 or 12.8% in the first half of 2012. Trinity's

improper accounting resulted in it reporting $1.9 million of income before taxes in 2010 instead of a $1.4 million loss and overstating its 2011 income before taxes by $5.1 million or 101.8%.

81.     Delaying the RainbowVision charge-off kept a multi-million dollar impairment loss from being recognized until after the OCC terminated the Formal Agreement on April 4, 2012.

   b.   Route 66, LLC

82.     Another egregious example of Trinity failing to properly measure the loss for impaired loans involved a $4.2 million loan that was originally intended to finance the purchase and renovation of an ethanol plant. During the relevant period, the loan was graded "substandard" and impaired, but Trinity failed to measure any impairment loss.

83.     In 2010, Trinity canceled an "as-is" appraisal for the property securing the Route 66 loan, which resulted in the appraisal providing only the higher "as-stabilized" value. Trinity, at Enloe's direction, then calculated an "as-is" value by subtracting $2.7 million of estimated costs-to-complete, which were provided by the borrower, from the "as-stabilized" value. Cook knew that Trinity was calculating its own "as-is" value. She questioned Enloe's decision to have Trinity calculate its own "as-is" value in lieu of getting an "as-is" appraisal. Cook believed that there was no basis for using an "as-stabilized" appraisal and backing out the renovation costs, but did not raise the issue with TCC's external auditors or the OCC. In fact, there was no reasonable basis for using the borrower's cost estimates to calculate the "as-is" value.

84.     During 2011, there was no significant progress in selling or renovating the Route 66 plant. In September 2011, Cook and Pierce each received an email indicating that the costs to finish construction of the plant would be $750,000 to $1,000,000 higher than the $2.7 million used in the impairment calculation. Cook and Pierce knew that the higher costs-to-complete were not being used by Trinity and that the false, lower, $2.7 million amount was being used in the remaining 2011 Action Plan impairment calculations, which resulted in overstating the value of the plant. This same flawed impairment calculation was also used in the Action Plan for the first quarter of 2012.

85.     In March 2012, Trinity took ownership of the plant and ordered a new appraisal to include both "as-is" and "as-completed" values for a plant able to produce ten million gallons of ethanol per year. On June 27, 2012, Trinity received the appraisal, which assigned an "as-is" value of $650,000, which would require a significant charge-off of approximately of $3.7 million.

86.     After meeting with Enloe, Cook told the loan officer the decision was made to reject the "as-is" appraisal and to have it deleted from Trinity's electronic loan file database. At Cook's instruction, the loan officer drafted a memo stating that the appraisal was rejected because it used unreliable cost estimates and placed the memo in the electronic loan file. The loan officer then deleted the appraisal from the electronic loan file on July 3, 2012, just before the OCC arrived at the bank for their annual exam.

87.     The Action Plan for the Route 66 loan for the quarter ended June 30, 2012 was sent to Cook and Pierce. The Action Plan used the old 2010 "as-

stabilized" appraisal and made no mention of the new "as-is" appraisal that was received and rejected days earlier. Additionally, the construction costs were increased slightly leaving the net collateral value equal to the loan amount, resulting in no impairment losses.

88.     Additionally, prior to Trinity filing its second quarter Form 10-Q on August 9, 2012, Trinity received an engineering report on the feasibility of completing the ethanol plant capable of producing six million gallons of ethanol per year, which estimated the total costs to complete as $7.5 million, far in excess of the $2.7 million cost Trinity continued to rely upon.

89.     No one provided a copy of the rejected appraisal or the engineering report to Trinity's accounting group or external auditors.

90.     In its restatement, Trinity determined that it should have recorded approximately $3.7 million of impairment losses on the Route 66 loan in 2011. Trinity's improper accounting resulted in it understating its 2011 provision for loan losses by 31.0% and overstating its 2011 income before income taxes by 57.8%.

   c.   <u>Griffin H. Pickard, Jr.</u>

91.     Trinity had a $2.7 million outstanding loan to Griffin Pickard, a local resident who owned a bank called Bank 1st. The Pickard loan was secured by Bank 1st stock. In late 2011, another bank was in negotiations with Pickard to acquire Bank 1st, and on February 11, 2012, entered into a letter of intent with Pickard contingent on Trinity's consent. A few days later, Trinity consented to the sale of Bank 1st subject to Trinity receiving a minimum of $1.65 million for the

stock securing its loan to Pickard at closing of the sale, an amount approximately $1 million below the value of the loan.

92.     On March 13, 2012, an Action Plan for the Pickard loan was prepared that included a reference to the letter of intent. The Action Plan, however, made no mention of the $1.65 million price that was consented to by Trinity, and there was no corresponding impairment calculation done to reflect any change in collateral valuation, and no losses were reported. Instead, the Action Plan valued the bank collateral at $2.7 million, the same value as the outstanding amount on the loan, despite Trinity having consented to a sale of the stock for $1 million less than that amount.

93.     On April 9, 2012 Cook was copied on an email stating that Trinity's newly hired outside auditor would be on site reviewing certain non-accrual loans, including Pickard. Cook was aware that, if the auditors learned about Trinity's consent to the sale, they could question how Trinity was accounting for the Pickard loan.

94.     Trinity ultimately recognized a $1.1 million impairment loss in the second quarter of 2012 using the $1.65 million price that was agreed to in the February 9, 2012 consent. The restatement corrected the timing of the loss and moved it to the fourth quarter of 2011.

95.     Trinity's improper accounting of the Pickard loan resulted in it understating its 2011 provision for loan losses by $1.1 million or 11.6% and overstating its 2011 income before income taxes by 12.0%. "Pushing out" the

Pickard charge-off kept a million dollar impairment loss from being recognized until after the OCC terminated the Formal Agreement on April 4, 2012.

### iii. Trinity Failed to Downgrade Loans on a Timely Basis.

96.     Throughout the relevant period, Trinity's loan portfolio included numerous loans that were graded as "pass," but should have been downgraded to "special mention" or "substandard." These grading errors resulted in the Bank understating its losses and ALLL because its lower graded loans generally carried a higher historical loss rate which would have increased the second component of the ALLL. The Bank's material misstatements regarding the second component of the ALLL, concerning the allowance of unimpaired loans, primarily stemmed from the Bank failing to grade properly hundreds of loans.

97.     Loan officers were responsible for assigning initial loan grades for each loan, initiating grade changes in a timely manner, and re-grading their loans periodically. If loan officers were unsure how to manage or account for a loan, the loan policy encouraged loan officers to present the loan for discussion, noting, "[s]enior management is accountable for loan grades decided at these meetings." Meetings during which potentially problematic loans were discussed were called "Level III" meetings. During Level III meetings, loan officers presented loans to Cook, Pierce, and other loan department employees to discuss strategies for improving Trinity's position and whether the loan was appropriately graded. Cook determined who attended the Level III meetings.

98.    Enloe and Cook directed Bank employees that any important decisions concerning loans, including loan grading decisions, were required to be approved by Pierce and Cook.

99.    Loans that would be 30 days or more past due at the end of each month were tracked on a past-due list. Each quarter, Trinity's Board of Directors received a list of all loan grade changes and a copy of the past due list. The loan policy also provided that loans that were in default for nonpayment of principal or interest for 90 days or more should be placed on nonaccrual status.

100.    During the relevant period, Trinity's loan department operated under a culture that discouraged downgrading loans to "special mention" or "substandard," since these loans carried a higher historical loss rate and would require additional losses to be reported. By not appropriately downgrading loans, Trinity materially understated its ALLL. Cook and Enloe set a tone at the top that created significant pressure for loan officers to avoid having "bad loans" in their loan portfolios, including any loans that were graded below "pass" and loans that were more than 30 days past due. As a result, Trinity's loan department ignored and hid loan weaknesses that required downgrades and waited as long as possible to downgrade loans below "pass."

101.    "Extend and pretend" refers to a technique for dealing with borrowers who cannot repay loans coming due. Generally, a bank may give such borrowers more time and/or better rates, hoping things will improve and the borrower will be able to repay the bank later. By keeping such troubled loans

classified as "performing," a bank can minimize their non-performing loans, ALLL, and provision for loan losses.

102.   "ABC Loans" were "Additional Balance Club" loans, which were unsecured loans with a high interest rate. They were tied to a borrower's checking or savings account and were intended as short-term overdraft protection. ABC Loans were not explicitly addressed in Trinity's loan policy; however, the loan policy did provide that "[l]oans for the purpose of funding interest on existing debt when the credit quality is poor and the loan is classified" were "undesirable loans," and were to be identified as exceptions to policy and "thoroughly documented by the loan officer." In other words, these loans were borrowers taking out additional loans to pay off existing loans, or bring them current, so that the existing loans were not overdue.

103.   Based on guidance and direction from Cook and Pierce, Trinity's loan department engaged in a variety of "extend and pretend" techniques to prevent downgrades on certain loan relationships, including authorizing checking account overdrafts and the extension of additional credit to borrowers who were unable to make their required principal and interest payments on their existing debt. Sometimes this additional credit would be granted using ABC Loans. Trinity used this additional credit to make required payments on the existing debt, which resulted in the borrower appearing current on loan payments when, in fact, Trinity was actually paying itself. In other instances, credit was extended to borrowers without the required credit analyses.

104.    Cook and Pierce knew or were reckless in not knowing that Trinity failed to properly downgrade loans on a timely basis, resulting in the fraudulent concealment of Trinity's true financial condition and material misstatements in TCC's financial statements. Cook and Pierce knowingly, recklessly, and negligently participated in a fraudulent scheme for that purpose, committed numerous acts in furtherance of this scheme, and aided and abetted the fraudulent misstatements made by Trinity in its public filings in 2010 through the second quarter of 2012.

a.    <u>Ted Waterman</u>

105.    An example of "extend and pretend" behavior involved $8.8 million in loans made to a long-time Trinity customer, a New Mexico real estate developer named Ted Waterman ("Waterman Loans"). The Waterman Loans consisted of approximately 30 loans made to Waterman or entities with which he was associated. Most of the loans were originated years earlier by Enloe or his assistant. According to Trinity's restatement work, prior to 2011, numerous Waterman Loans should have been downgraded to "substandard" and $3.7 million of impairment losses should have been reported. In 2011 and 2012, several other Waterman Loans should have been considered TDRs, should have been downgraded, and should have resulted in additional losses being reported.

106.    By 2010, Waterman was having difficulty making his loan payments. In February 2010, Waterman was extended additional credit to service the debt payments and keep the Waterman Loans off the past due list. Similarly,

in May 2011, Trinity extended Waterman additional funds, despite information indicating that the relevant Waterman entity did not have cash flow, was behind in property taxes, and "could not support a good argument for any new debt[.]" Extending additional credit – often through ABC Loans – was a practice Trinity frequently used to keep Waterman off the past-due list between 2010 and the second quarter of 2012.

107.    As early as February 2010, Cook was notified that Trinity was extending additional funds to Waterman to keep him off of the past due list when two employees raised concerns with the practice; however, Cook refused to follow up on the employees' concerns.

108.    Cook, and other employees, at her direction, also engaged in deceptive behavior to keep the Waterman Loans from being downgraded and "off the radar" of the OCC. As Trinity was preparing for the 2011 OCC examination, Cook asked Pierce to confirm that none of the Waterman loans were on the list of the loans being reviewed by the OCC. She knew Trinity did not have a thorough analysis of the Waterman Loans and was not comfortable that they were appropriately graded. A loan officer sent an email instructing another loan officer not to mention Waterman to the OCC examiners "AT ALL if avoidable. … They cannot look at this relationship!" He forwarded that email to Cook and Pierce, stating, "FYI, I sent this email … about Ted Waterman hoping that his name will not come up in discussions …."

109.    In late 2011, a loan officer recommended a plan to restructure the Waterman Loans so that the monthly payments would be an amount that

Waterman could pay without Trinity extending additional credit, which he emailed to Cook, Pierce, and other loan department employees. On or about December 14, 2011, a Level III meeting with Cook and Pierce occurred at which the Waterman Loans were presented for discussion. Enloe refused to allow the discussion. After the meeting, the junior loan officer told Enloe that the Waterman Loans might need to be downgraded because of negative cash flow. Enloe told him not to do anything. No restructuring occurred and the Waterman Loans were not downgraded.

110. During the 2012 OCC Exam, Cook told a loan officer to shred loan guarantees that Waterman had signed that had never been imaged into the Bank's electronic loan file system.

111. Following the 2012 OCC Exam, the OCC required Trinity to charge off $3.6 million in losses relating to the Waterman Loans and Trinity disclosed the charge off in its Form 10-Q for the second quarter of 2012.

b. Brian and Mary Beth Olds

112. On March 28, 2011, an internal audit employee downgraded several loans that had been identified for referral to the legal department or designation as a non-accrual loan at the end of the month, including a construction loan to Brian and Mary Beth Olds for over $1 million.

113. The downgrades occurred without Cook or Pierce being consulted. Earlier in the month, however, Pierce had emailed Cook, stating that the Olds relationship needed to be downgraded to "substandard" and moved to

nonaccrual because the Olds "have no money to pay, and we are likely going to have to foreclose[.]"

114.    Despite knowing that the Olds were unable to make their required payments, on March 30, 2011, after conferring with Cook, Pierce arranged a loan to the Olds for additional funds to make an overdue interest payment and to pay off a prior ABC Loan that was used to make an interest payment and keep the loan off the past due list.

115.    Just prior to issuing the new loan, Pierce discovered the downgrade by internal audit. Pursuant to loan policy, Pierce could not extend credit to a substandard borrower without Board approval. So, with Cook's approval, Pierce backdated the new loan to March 25, 2011, to make it appear as if he extended credit before the downgrade. Pierce emailed Cook, "I think we came up with a solution to my voice mail. The downgrade occurred on 3/28, we are going to date the loan documents 3/25. Does that work?" One minute later, in a new, separate email, Cook wrote in the subject line, "Do it" and in the body of the email "And ask forgiveness later!"

116.    Upon learning that internal audit downgraded the loan, Cook sent an email, copying Pierce, explaining, "[w]e wait until the end of the month and downgrade those over 90 days" and asked to discuss the downgrades internal audit instituted. The loan was upgraded to "pass." A few weeks later, however, internal audit placed the Olds loan on the list of loans to be reviewed by an outside consultant. Before the consultant arrived at Trinity to conduct its review, the Olds loan was again downgraded to "substandard."

117.    Once the loan was downgraded, an Action Plan was prepared by the loan officer and reviewed by Pierce. Pierce emailed Cook and the loan officer with his comments, which included removing references to a prior ABC Loan that was used to make an interest payment because "that could open up the discussion as to why this loan was not downgraded earlier" and "skirt[ing]" the lack of cash flow "because we are going to have a tough time arguing that this should not be on non-accrual." The loan officer made Pierce's edits.

118.    Proper accounting for this loan would have resulted in it being classified as a TDR and Trinity recognizing $186,000 of impairment losses through 2011.

### iv.    Trinity Failed to Take Appropriate Losses on OREO.

119.    Cook also avoided necessary write downs on OREO properties by interfering with Trinity's appraisal process and obtaining appraisals late. According to the restatement, in 2011, OREO impairment losses were understated by $364,000 (10.1%).

120.    During the relevant period, it was Trinity's practice to order appraisals on properties that were moving into OREO and annual appraisals on properties that remained in OREO.

121.    Although GAAP requires a company to include information about events occurring before the end of a period in financial statements, even if the information is received after the end of the period, as detailed below, Trinity did not always consider appraisals and other information received after the end of a

period, but before the financial statements were filed, in its loan and OREO impairment accounting.

122.    Cook knew or was reckless in not knowing that avoiding necessary write downs on OREO properties by interfering with Trinity's appraisal process and obtaining appraisals late would cause TCC to understate its OREO impairment losses. Cook knowingly, recklessly, and negligently participated in a fraudulent scheme for that purpose, committed numerous acts in furtherance of this scheme, and aided and abetted the fraudulent misstatements made by Trinity in its public filings in 2011 through the second quarter of 2012.

a.    <u>Failure to Consider Appraisals Received After The Balance Sheet Date</u>

123.    In April 2011, an accounting department employee highlighted for Cook that write downs stemming from appraisals raised potential issues with respect to subsequent events and that it would be desirable to "get[] these appraisals much earlier and avoid appraisals done at a time where they end up coming in before we publish the 10Q and 10K[.]" Another employee raised the issue again in November 2011 when she told Cook that she had been asked to order appraisals required through March 2012 so that the Bank could avoid issues with subsequent events. She told Cook, "[i]f I order January, February and March 2012 now I can only imagine what our [charge off] number will be at [end of the year] due to appraisal write-downs." She therefore requested permission to ask for a March 16, 2012 delivery date for the January and February 2012 appraisals instead. This was one day after TCC filed its 10-K and therefore

appraisals received on or after the March 16, 2012 would not have to be considered in TCC's 2011 10-K. Enloe and Cook agreed with this proposal.

124.    Despite these repeated warnings, in January 2012, Trinity received two OREO property appraisals with valuation dates of December 2011. On January 24, 2012, an employee sent write down instructions for both properties to Cook and others. Cook failed to notify the accounting department of the January 2012 appraisals or to take any other actions to ensure that the write downs were properly included in the December 31, 2011 financial statement. As a result, these ORIO losses were not reported in TCC's annual filing for 2011, as they should have been, but were delayed until 2012. This allowed Trinity to avoid taking the losses until after the Bank was released from the OCC agreement.

b.    SystemBilt Unit Structures, LLC

125.    In early 2011, the Bank was in the process of foreclosing on a facility that was held as collateral on a loan to SystemBilt Unit Structures, LLC. The facility had appraised for $1 million in February 2010, and the loan had been "substandard" since March 2010.

126.    On March 24, 2011, an employee notified Cook that Trinity had received a new appraisal that valued the property at $550,000, noted that additional discounts would likely need to be taken, and stated that she would set up a meeting to discuss the matter in a few days. Cook responded by asking the employee to push the meeting back by a week and to limit attendance to her, the employee, and one other employee "to formulate a plan." Cook delayed the

meeting so that she could confer with Enloe. On March 28, 2011, another employee notified Cook that the appraisal was correct.

127.   On April 4, 2011, Cook instructed employees not to use the March 2011 appraisal in booking the property to OREO and to order another appraisal from a different appraiser. Enloe had directed Cook not to use the March 2011 appraisal and to hire a different appraiser to conduct another appraisal. Even though Cook knew Enloe's instruction did not follow Trinity's loan policy she followed Enloe's instructions by directing the OREO employees not to use the appraisal.

128.   On April 28, 2011, the Bank booked Systembilt into OREO using the February 2010 appraisal, which valued the property at $1 million.

129.   On June 22, 2011, the Bank received the second appraisal, which valued the property at $382,000, even lower than the March 2011 appraisal.

130.   Upon receiving an appraisal with an even lower value, Cook instructed employees to use the March 2011 appraisal with the value of $550,000.

131.   As a result of this conduct, the Bank improperly failed to recognize approximately $444,000 of losses as of March 30, 2011 resulting in it understating its provision for loan losses by 5.1%.

c.   W. David Jansen

132.   Cook delayed write-downs on OREO property by delaying and ignoring valid appraisals with respect to vacant land previously owned by W. David Jansen, which was booked to OREO in 2010.

133.    In August 2011, Cook was notified that an updated appraisal valued the property at $200,000 and, as a result, a $314,100 write-down was required.

134.    On October 12, 2011, an OREO employee circulated to Cook and others write down instructions for Jansen, explaining that the appraisal review confirmed the accuracy of the $200,000 appraisal. Cook requested copies of the appraisal and review, and then instructed a loan department collections employee to "wait until next month" to take the write-down.

135.    On November 28, 2011, the OREO employee sent another set of write-down instructions to Cook and others. Cook again instructed a loan department collections employee, "[d]on't do this yet." Cook then asked employees, "[d]o you have anything written up about how we are pursuing changes to the entitlements so that the property will appraise for more than the appraisal we have on hand?" The responses indicated that pursuing changes would take significant time and effort.

136.    On December 1, 2011, another appraisal was ordered. When Cook was notified that the appraisal would not be completed until January 25, 2012, she responded "[s]ounds good."

137.    The January 14, 2012 appraisal came back with a value of $225,000. On February 9, 2012, an OREO department employee sent write-down instructions, which were booked as of February 29, 2012.

138.    With respect to the February 2012 Jansen write down, Cook also ignored the accounting department's instructions and the GAAP regarding

subsequent events by permitting the OREO write-down to occur in the first quarter of 2012 instead of the fourth quarter of 2011.

139.    Cook knew or was reckless in not knowing that Trinity failed to take appropriate losses in OREO, resulting in the fraudulent concealment of Trinity's true financial condition and material misstatements in TCC's financial statements. Cook knowingly, recklessly, and negligently participated in a fraudulent scheme for that purpose and aided and abetted Trinity's fraudulent misstatements.

E.    **Trinity's Antifraud Violations**

140.    As a result of the fraudulent scheme, Trinity materially misstated its ALLL and loan loss provisions in its annual and quarterly reports filed during 2010, 2011, and the first two quarters of 2012.

141.    Those misstatements were material as they allowed Trinity to significantly overstate its income and other key metrics reported to investors.

142.    In its 2010 annual filing, Trinity understated its loan loss provision by 25%, its impaired loans by 81%, and its TDRs by approximately 879%. Trinity also reported income before taxes of $1.9 million, when it should have reported losses of $5.4 million, and reported net loss available to common shareholders of $444,000 when it should have reported net loss available to common shareholders of $4.2 million.

143.    In its 2011 annual filing, Trinity understated its loan loss provision by 73%, its impaired loans by 70%, and its TDRs by approximately 643%. Trinity also reported before tax income of $10 million, when it should have reported losses of $13.7 million, and reported net income available to common

shareholders of $5 million when it should have reported net loss available to common shareholders of $25.5 million.

144.    In its filing for the first quarter of 2012, Trinity misstated its impaired loans. Trinity also reported before tax income of $4 million, when it should have reported losses of $467,000 and net income available to common shareholders of $2 million when it should have reported net loss available to common shareholders of $1 million.

145.    In its filing for the second quarter of 2012, Trinity misstated its impaired loans. Trinity also reported before tax losses of $3.9 million, when it should have reported losses of $2 million; and reported net losses available to common shareholders of $2.8 million when it should have reported net loss available to common shareholders of $2.3 million

146.    Trinity's financial misstatements allowed it to report its 2011 Tier 1 capital ratio above the OCC desired 10%. The restated capital Tier 1 ratio was 7.8%, or 27.2% below the originally reported ratio of 10.7.

147.    Through the fraudulent statements regarding Trinity's ALLL and loan loss provision, Trinity also engaged in a fraudulent scheme to conceal from investors and the OCC the true nature of its loan portfolio and assets. The fraudulent scheme to hide and misstate the true nature of Trinity's loan portfolio and to deceive its primary regulator was material because a reasonable investor would consider information about assets and deceit of regulators important in making an investment decision.

**F.**     **Cook's Antifraud Violations**

148.    Cook violated, or in the alternative aided and abetted Trinity's violations of, Section 10(b) and Rule 10b-5(a) and (c) and Section 17(a)(1) and (3). In addition to the misstatements in Trinity's filings, Cook's knowledge and use of the fraudulent "extend and pretend" and inaccurate valuation tactics described above constituted the employment of a scheme to defraud and an act, practice, or course of business that operated as a fraud or deceit upon the investing public and the OCC. Cook also engaged in specific acts in furtherance of the scheme that were inherently deceptive, including:

a.  She refused to address employee concerns about the extension of additional credit in the form of ABC Loans in order to keep a troubled borrower off the past due list that went to the Board.

b.  She authorized Pierce to backdate documents.

c.  She rejected appraisals because they indicated a lower value on collateral.

d.  She instructed Trinity employees to configure Trinity's electronic loan file system to limit the information available to the OCC and external auditors and instructed employees to set up the OCC's loan file access in a manner in which the OCC would not have access to five or six "Document Types" within the electronic loan files, including "miscellaneous," various correspondence files, and audit sheets.

e.  During the 2012 OCC exam, she asked a loan officer to shred loan documents.

f.   Despite being aware that a document was deleted from Trinity's electronic loan file during the 2012 OCC exam, she failed to notify the OCC, auditors, or Audit Committee, and she failed to speak up during a meeting during which the OCC questioned the employee about the deletion.

g.   She permitted Action Plans to be presented to the BCC, OCC, and outside auditors when she knew, or was reckless in not knowing, that they included inaccurate information.

149.   Cook also aided and abetted Trinity's violations of Section 17(a)(2) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5(b) thereunder with respect to the misstatements of Trinity's ALLL and loan loss provisions that were made in its annual and quarterly reports. She knew of the primary violations and substantially assisted them as detailed above. As detailed above, the misstatements were both objectively false and material. Cook knew about the misstatements, or was at least reckless in not knowing about the misstatements, and she substantially assisted Trinity in the its failure to report losses and increases to its ALLL, downgrade loans on a timely basis, identify impaired loans, and measure properly impairments and OREO write downs. For example:

a.     She implemented and perpetuated the culture of intolerance for downgrading loans and, without downgrading "pass" loans to "special mention" or "substandard," permitted employees to engage in the "extend and pretend" tactics to avoid loans having to be downgraded to "special mention" or "substandard." For example, Cook directed extending additional credit to troubled borrowers to enable them to make payments on existing debt.

b.      She also encouraged and instructed employees to wait as long as possible to downgrade loans. For instance, she instructed that "[w]e wait until the end of the month and downgrade those over 90 days," a practice that did not conform with Trinity's loan policy.

c.      Despite being aware of the "extend and pretend" tactic of issuing additional credit to troubled borrowers to enable them to make payments on existing debt, including with ABC Loans, she did nothing to curtail the practice. In the instance of Waterman, she knew the practice was being used to keep Waterman off the past due list, yet she failed to take any action to downgrade the loans, and explicitly refused to create guidance and policies governing the use of ABC Loans.

d.      In July 2011, Cook received an email in which a loan officer instructed another loan officer not to mention Waterman to the OCC examiners. Rather than following up on this red flag, she was simply "relieved" that the OCC was not reviewing the loans.

e.      She approved Pierce's backdating loan documents to make it appear that funds had been given to a borrower before his loans were downgraded to "substandard" by the internal audit department. She permitted the loans to be "upgraded" to "pass" over internal audit's objection, despite the fact that there was no factual basis to support the upgrade.

f.      In a December 8, 2011 email and memo from Pierce, Cook was notified of numerous significant problems with a loan, including that a charge off of at least $400,000, possibly $1 million, was needed. Nonetheless, she did not

designate the loan as impaired and measure the impairment. At the end of 2011, the loan was not designated as impaired, and key facts were omitted from the December 21, 2011 Action Plan that was drafted by Pierce and reviewed by Cook.

g.      She instructed employees to reject and not use appraisals that indicated lower values on Trinity's collateral and OREO properties.

h.      She knew that Trinity's appraisal ordering process was being manipulated improperly to cancel "as-is" appraisals, but did nothing to stop the practice.

i.      She knew that collateral was worth significantly less – sometimes millions of dollars less – than the amounts used in impairment measurements, yet she did nothing to correct the impairment measurements.

j.      Despite knowing about the fraudulent conduct and erroneous accounting, including the "extend and pretend" tactics, appraisals and other relevant valuation evidence that was being ignored, and miss-graded loans, she signed sub-certifications to Trinity's misleading financial statements.

G.      **Pierce's Antifraud Violations**

150.    In 2011 and 2012, Pierce violated, or in the alternative aided and abetted Trinity's violations of, Securities Act Section 17(a)(1) and (3) and Exchange Act Section 10(b) and Rule 10b-5(a) and (c). Pierce's knowledge and use of the fraudulent "extend and pretend" and inaccurate valuation tactics to avoid loans being downgraded to "special mention" or "substandard" described above constituted the employment of a scheme to defraud and an act, practice,

or course of business that operated as a fraud or deceit upon the investing public and the OCC. Pierce also engaged in specific acts in furtherance of the scheme that were inherently deceptive, including

    a. He backdated documents.

    b. He instructed employees to draft documents to omit information that would potentially flag loan modifications as TDRs.

    c. He suggested that two borrowers terminate an entity that they owned together so that if the OCC reviewed loans to one borrower, it would not review loans related to the second borrower.

    d. He drafted and reviewed Action Plans that were false and misleading and permitted Action Plans to be presented to the BCC, OCC, and outside auditors when he knew, or was reckless in not knowing, that they included inaccurate information.

151.    Pierce also aided and abetted Trinity's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder with respect to the misstatements of Trinity's ALLL and loan loss provisions that were made in its annual and quarterly reports. In 2012, Pierce also aided and abetted Trinity's violations of Securities Act Section 17(a)(2) in connection with the misstatements to the ALLL and loan loss provisions in Trinity's Forms 10-Q. Pierce knew of the primary violations and substantially assisted them as detailed above. As detailed above, the misstatements were both objectively false and material. Pierce knew about the misstatements, or was at least reckless in not knowing about the misstatements, and he substantially assisted Trinity it is failure to downgrade timely loans graded

as "pass," identify impaired loans, and properly measure impairments. For example:

a. He perpetuated the culture of intolerance for downgrading loans and permitted employees to engage in the "extend and pretend" tactics to avoid loans having to be downgraded to "special mention" or "substandard."

b. In July 2011, Pierce received an email in which a loan officer instructed another loan officer not to mention Waterman to the OCC examiners. He took no action in response to the email.

c. He backdated loan documents to make it appear that funds had been given to a borrower before the loans were downgraded to "substandard" by the internal audit department. He permitted the loans to be "upgraded" to "pass" over internal audit's objection, despite the fact that there was no factual basis to support the upgrade.

d. Without designating the loan impaired or obtaining the required Board Loan Committee approval, he overdrew a borrower's checking account to cover required loan payments. He later signed a backdated approval memorandum that falsely made it appear as if approval was granted prior to the overdraft.

e. By at least December 8, 2011 he knew of numerous significant problems with T de Z, including that a charge off of at least $400,000, possibly $1 million, was needed. Nonetheless, he did not designate the loan as impaired and measure the impairment and he drafted an action plan that omitted material facts.

f.   He knew that collateral was worth significantly less – sometimes millions of dollars less – than the amounts used in impairment measurements, yet he did nothing to correct the impairment measurements.

### H.   Trinity, Cook, and Pierce Failed to Devise and Maintain Sufficient Internal Accounting Controls and Cook and Pierce Circumvented Internal Accounting Controls

152.   Trinity's misstated ALLL and loan loss provisions were caused by the fraudulent conduct undertaken by Cook, Pierce, and employees at their direction. In addition, as detailed above, in numerous instances, Cook, Pierce, and others, at their direction, knowingly circumvented Trinity's internal accounting controls by, among other things, permitting the extension of additional credit without the appropriate financial analysis or supervisory approval, backdating documents, and improperly "rejecting" appraisals.

153.   The fraudulent conduct was also aided by Trinity's failure to devise and maintain sufficient internal accounting controls. Specifically, Cook and Pierce knowingly failed to implement sufficient internal controls over the loan department and loan accounting, including:

a.      Internal controls over loan grades. Trinity did not have in place a systematic and comprehensive loan review program to ensure loans were properly graded. Trinity's internal loan review employee, who ultimately reported to Cook, had limited training, was not independent, and failed to appropriately address loan grading misses and loan administration and documentation problems he identified. Also, while Trinity hired a third-party firm to review loans, the reviewers were misled to believe they had full access to the Bank's loan files when their access was limited to only certain documents. Finally, Cook

intentionally limited meetings during which troubled loans were discussed to loan department employees thereby avoiding the oversight and input of the accounting department.

b.     Internal controls over the use of ABC Loans. As described above, by at least February 2010, employees requested that Cook provide guidance on ABC Loans; however, she refused. Trinity employees were not provided with any formal guidance on the proper use of ABC Loans, including how to consider the effect of the ABC loans on, among other things, the loan rating and potential impairment.

c.     Internal controls over the analysis of TDRs. Trinity's internal loan approval and credit review documents failed to require an analysis of whether a loan or a modification was a TDR in conformity with GAAP. Similarly, in some instances, feedback and working papers from a consultant indicated that a TDR analysis should be performed on specific loans; however, there were no controls in place to confirm that this feedback was reviewed, noted, and acted upon. Further, TDRs were rarely discussed within the loan department, and employees were not properly instructed as to how and when to analyze modifications as potential TDRs. As a result, numerous loans should have been designated as TDRs because a new loan was provided to pay interest or principal due on an existing loan, rendering both loans TDRs; however, Trinity's loan policy failed to address this situation as a "concession."

d.     Internal controls over its accounting for impaired loans in conformity with GAAP. Loan department personnel calculating the impaired loan losses did

not possess sufficient accounting expertise, and there was not adequate involvement or review by the accounting department. As a result, impaired loan calculations were done incorrectly by limiting collateral valuation to inappropriate or outdated appraisals and ignoring other current and relevant information about collateral value.

e. <u>Internal controls over appraisals</u>. Trinity lacked sufficient internal controls over the appraisal ordering and evaluation processes. Specifically, there were insufficient internal controls to ensure appraisals were received timely, contained the appropriate type of value for accounting purposes, and were timely reviewed leading to appropriate acceptance or rejection of the appraisal. For example, appraisals were sometimes not ordered timely, delayed, ordered without the requirement for an "as-is" fair value, inappropriately rejected by Cook or Pierce, or obtained from an unapproved appraiser.

f. <u>Internal controls over evidence obtained after the balance sheet date</u>. Appraisals received after the balance sheet date and other events were not always considered, as required by GAAP, in Trinity's loan and OREO impairment accounting. Trinity and Cook were aware of this issue by at least 2009 when Trinity's outside auditor found a $2.2 million subsequent event accounting error. Further, Trinity's internal audit and accounting departments continued to stumble across appraisals received after the balance sheet date that had not been factored into Trinity's accounting; nonetheless, no controls were implemented to ensure that these appraisals and information was properly used by Trinity in its impairment accounting.

g. Internal controls over the loan department's electronic files and systems. Controls were inadequate to ensure all received appraisals were preserved in Trinity's database. Numerous employees, including loan officers, had edit rights to these systems allowing them to alter or delete data about loans, appraisals, collateral values, and customers. Because of these inadequacies, employees could delete appraisals or change collateral values without documenting why the alterations were made. When appraisals and collateral values were deleted, the result was that information was hidden from the OCC and other third parties, as well as other Trinity employees.

## I. Trinity, Cook, and Pierce Falsified and Failed to Keep Accurate Books and Records.

154. Trinity failed to keep books and records that accurately reflected loan grades, whether loans were impaired, whether loans were TDRs, and the value of collateral and, as a result, Trinity's books and records did not accurately reflect its ALLL and loan loss provisions.

155. Cook and Pierce allowed loans to be improperly graded, failed to identify TDRs and other impaired loans, improperly measured impairments, and failed to report required losses and increases to the Bank's ALLL.

156. As a result, in carrying out their fraudulent scheme, Cook and Pierce indirectly caused the Bank's books to state loan grades, impairment decisions, TDR decisions and impairment measurements that were not in conformity with GAAP.

157.    Cook also failed to take appropriate losses on OREO. As a result, Cook indirectly caused the Bank's books to state OREO impairment measurements that were not in conformity with GAAP.

**J.    Cook and Pierce Misled Auditors**

158.    Cook, as CCO, and Pierce, as SLO, are each officers of Trinity subject to Rule 13b2-2 under the Exchange Act.

159.    As CCO, in March of 2012, Cook signed a management representation letter in connection with its audit of Trinity's 2011 financial statements. The representation letter falsely stated, among other things, that: (i) Trinity maintained effective internal control over financial reporting; (ii) there were no material weaknesses in internal controls; and (iii) she had no knowledge of any fraud or suspected fraud.

160.    In addition, Cook and Pierce were aware of false and misleading information in Action Plans, which were provided to the auditors.

161.    Cook and Pierce were also aware of material information regarding Trinity's loan portfolio, which was not provided to its auditors. That information included: (i) Trinity's failure to follow GAAP and its own loan policy in grading loans, designating loans as impaired, and designating loans as TDRs; (ii) significant borrower relationships in which the borrower had indicated an inability to pay and yet the Bank failed to downgrade the loans below "pass"; (iii) appraisals and other valuation evidence that was not used in measuring impairments on impaired loans and OREO.

162.    Cook also failed to tell Trinity's auditors that they were not provided access to Trinity's entire electronic loan file system and that items including correspondence with borrowers were omitted from the auditors' login view.

**K.    Cook and Pierce Aided and Abetted Trinity's False Filings.**

163.    Trinity violated the reporting provisions of the Exchange Act by filing false and misleading annual and quarterly reports.

164.    In its annual and quarterly filings, Trinity misstated its loan loss provision, impaired loans, TDRs, income, and losses.

165.    Trinity's financial misstatements allowed it to report its 2011 Tier 1 capital ratio above the OCC desired 10%. The restated Tier 1 capital ratio was 7.8%, or 27.2% below the originally reported ratio of 10.7.

166.    As described in detail above Cook and Pierce aided and abetted these violations by, among other things, knowingly or recklessly refusing to downgrade loans on a timely basis, including hiding problem loans by extending loan maturities, reducing interest rates, or lending new money to delinquent borrowers to service the existing debt; failing to designate loans as impaired, including failing to designate modified and restructured loans as troubled debt restructurings or TDRs; failing to measure the impairment properly on impaired loans; and purposely overvaluing real estate owned by the bank.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a)(1) and (3) of the Securities Act
### [15 U.S.C. § 77q(a)(1) and (3)]

167.    The Commission incorporates the allegations of paragraphs 1 through 148 and 150 as if fully set forth herein.

168.    Cook and Pierce each, directly or indirectly, with scienter, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme, or artifice to defraud, in violation of Section 17(a)(1) of the Securities Act.

169.    Cook and Pierce each, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of securities, in violation of Section 17(a)(3) of the Securities Act.

170.    By virtue of the foregoing, defendants Cook and Pierce each, directly or indirectly, violated, and unless enjoined, will again violate, Section 17(a)(1) and (3) of the Securities Act.

## SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Aiding and Abetting Violations of Section 17(a)(1) and (3)
### of the Securities Act
### [15 U.S.C. § 77q(a)(1) and (3)]
### (In the Alternative)

171.    The Commission incorporates the allegations of paragraphs 1 through 148 and 150 as if fully set forth herein.

172.    Trinity directly or indirectly, with scienter, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, employed a device, scheme, or artifice to defraud, in violation of Section 17(a)(1) of the Securities Act.

173.    Trinity directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which have been or are operating as a fraud or deceit upon the purchasers of securities, in violation of Section 17(a)(3) of the Securities Act.

174.    In the alternative, defendants Cook and Pierce each aided and abetted the Trinity's violations by knowingly or recklessly providing substantial assistance to those violations.

175.    By virtue of the foregoing, defendants Cook and Pierce each aided and abetted violations of, and unless enjoined, will again aided and abet violations of, Section 17(a)(1) and (3) of the Securities Act

### THIRD CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act
### [15 U.S.C. § 77q(a)(2)]

176.    The Commission incorporates the allegations of paragraphs 1 through 147, 149, and 151 as if fully set forth herein.

177.    Trinity violated Exchange Act Section 17(a)(2) of the Securities Act by, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtaining money or property by means of untrue statements of material fact or by omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

178.    Defendants Cook and Pierce each aided and abetted the Trinity's violations by knowingly or recklessly providing substantial assistance to those violations.

179.    By virtue of the foregoing, defendants Cook and Pierce each aided and abetted violations of, and unless enjoined, will again aided and abet violations of, Section 17(a)(2) of the Securities Act.

### FOURTH CLAIM FOR RELIEF
### Fraud in the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
### and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder

180.    The Commission incorporates the allegations of paragraphs 1 through 148 and 150 as if fully set forth herein.

181.   Cook and Pierce each, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, employed devices, schemes, or artifices to defraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a).

182.   Cook and Pierce each, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person; in violation of Section 10(b) of the Exchange Act and Rule 10b-5(c).

183.   By virtue of the foregoing, defendants Cook and Pierce each, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

### FIFTH CLAIM FOR RELIEF
**Fraud in the Purchase or Sale of Securities
Aiding and Abetting Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)]
and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder
(In the Alternative)**

184.   The Commission incorporates the allegations of paragraphs 1 through 148 and 150 as if fully set forth herein.

185.   Trinity directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange,

employed devices, schemes, or artifices to defraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a).

186.    Trinity directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person; in violation of Section 10(b) of the Exchange Act and Rule 10b-5(c).

187.    In the alternative, defendants Cook and Pierce each aided and abetted the violations of Trinity Capital by knowingly or recklessly providing substantial assistance to those violations.

188.    By virtue of the foregoing, defendants Cook and Pierce each aided and abetted violations of, and unless enjoined, will again aid and abet violations of, Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

## SIXTH CLAIM FOR RELIEF
### Fraud in the Purchase or Sale of Securities
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b) thereunder

189.    The Commission incorporates the allegations of paragraphs 1 through 147, 149, and 151 as if fully set forth herein.

190.    Trinity violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder by, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, making untrue statements of material fact or omitting to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.

191.    Defendants Cook and Pierce each aided and abetted the Trinity's violations by knowingly or recklessly providing substantial assistance.

192.    By virtue of the foregoing, defendants Cook and Pierce each aided and abetted violations of, and unless enjoined, will again aid and abet violations of, Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

### SEVENTH CLAIM FOR RELIEF
### Falsified Books, Records, or Accounts
### Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1
### [15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1]

193.    The Commission incorporates the allegations of paragraphs 1 through 147 and 152 through 162 as if fully set forth herein.

194.    Defendants Cook and Pierce each knowingly circumvented or knowingly failed to implement a system of internal accounting controls to make and keep books, records, and accounts of Trinity Capital, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of the company, or knowingly falsified or caused to be falsified Trinity's books, records or accounts.

195.    By reason of the foregoing, defendants Cook and Pierce each violated and unless restrained and enjoined will in the future violate Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.

## EIGHTH CLAIM FOR RELIEF
### Deceit of Auditors
### Violations of Rule 13b2-2 under the Exchange Act
### [17 C.F.R. § 240.13b2-2]

196.    The Commission incorporates the allegations of paragraphs 1 through 147 and 154 through 162 as if fully set forth herein.

197.    By engaging in the conduct described above, defendants Cook and Pierce each made, or caused to be made, materially false or misleading statements to an accountant in connection with audits, reviews or examinations of Trinity's financial statements or in the preparation or filing of Trinity's documents or reports required to be filed with the Commission; or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with audits, reviews or examinations of financial statements or in the preparation or filing of Trinity's documents or reports required to be filed with the Commission.

198.    By reason of the foregoing, defendants Cook and Pierce each violated and unless restrained and enjoined will in the future violate Rule 13b2-2 of the Exchange Act.

## NINTH CLAIM FOR RELIEF
### False SEC Filings
### Aiding and Abetting Violations of
### Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13
### [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]

199.    The Commission incorporates the allegations of paragraphs 1 through 147 and 163 through 166 as if fully set forth herein.

200.     Trinity, which was an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed materially false and misleading reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

201.     By engaging in the conduct described above, defendants Cook and Pierce each knowingly or recklessly provided substantial assistance to Trinity in committing reporting violations.

202.     By reason of the foregoing, defendants Cook and Pierce each aided and abetted, and unless restrained and enjoined, will in the future aid and abet Trinity violations of Section 13(a) of the Exchange Act and the rules thereunder.

**<u>TENTH CLAIM FOR RELIEF</u>**
**Falsified Books, Records, or Accounts**
**Aiding and Abetting Violations of Section 13(b)(2) of the Exchange Act**
**[15 U.S.C. § 78m(b)(2)]**

203.     The Commission incorporates the allegations of paragraphs 1 through 147 and 154 through 157 as if fully set forth herein.

204.     Trinity, in violation of Section 13(b)(2) of the Exchange Act, failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as

necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and any other criteria applicable to such statements.

205.   By engaging in the conduct described above, defendants Cook and Pierce each knowingly or recklessly provided substantial assistance to Trinity in committing these violations.

206.   By reason of the foregoing, defendants Cook and Pierce each aided and abetted, and unless restrained and enjoined will in the future aid and abet, Trinity's violations of Section 13(b)(2).

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Find that defendants Cook and Pierce each committed the violations alleged in this Complaint;

### II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the defendants from violating, directly or indirectly, the laws and rules alleged in this Complaint;

### III.

Order that Cook and Pierce be permanently prohibited from acting as an officer or director of any public company;

**IV.**

Order that each of the defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court;

**V.**

Grant such other relief as this Court may deem just or appropriate.

The Commission demands a trial by jury.

Respectfully submitted this 28th day of September, 2015.

s/ Polly Atkinson
Polly Atkinson
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1500
Denver, CO 80
(303) 844-1000
AtkinsonP@sec.gov,  Frederickk@sec.gov
*Attorneys for Plaintiff*